# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

**AARON ABADI**

82 Nassau Street Apt 140

New York, NY 10038,

         Plaintiff

V.

**NATIONAL RAILROAD**

**PASSENGER CORPORATION**

**DBA AMTRAK**

400 West 31st Street, 5th Floor

New York, NY 10001,

         Defendant.

CASE # _____

**ORIGINAL COMPLAINT**

& JURY DEMAND

December 27, 2025

## PRELIMINARY STATEMENT

1)    This case challenges systemic and intentional disability discrimination by

National Railroad Passenger Corporation ("Amtrak"), a federally chartered and publicly funded

entity, which denied Plaintiff Aaron Abadi equal access to its services for over 15 months based

solely on his disability. Despite being a common carrier subject to federal anti-discrimination

laws, Amtrak has engaged in repeated and unlawful conduct that reflects a pattern of disregard

for the rights of disabled passengers — particularly those with sensory and neurological disabilities that may not be visibly apparent.

2)    The Plaintiff, who requires specific accommodations in order to travel safely and without undue hardship, was met with resistance, hostility, and exclusion by Amtrak personnel and policies. Rather than engaging in any interactive process or providing reasonable modifications, Amtrak treated Plaintiff with suspicion and animus, ultimately denying him access to transportation services in violation of federal law.

3)    The laws at issue include the Americans with Disabilities Act (ADA), the Rehabilitation Act of 1973, relevant state and city laws, and various other laws and statutes. These laws were enacted to ensure that individuals with disabilities are not relegated to second-class status in accessing public accommodations and federally supported services. Amtrak's failure to comply with these mandates — coupled with its invocation of an inaccessible arbitration system as a shield from accountability — underscores the need for judicial intervention.

4)    Plaintiff brings this action not only to remedy the specific harms he has endured, but to challenge broader practices that affect countless travelers with disabilities. Amtrak cannot simultaneously benefit from federal funding and immunity from suit while operating in flagrant violation of the very civil rights laws that govern its conduct.

5)    This Complaint seeks compensatory and punitive damages, declaratory and injunctive relief, and any further remedies the Court deems just and proper to ensure that Amtrak fulfills its obligations to all Americans — including those with disabilities.

6)      Plaintiff, Aaron Abadi, brings this action pro se, against the defendant, Amtrak, alleging that defendant discriminated against him due to his disability, conspired to deny him his civil rights, and neglected to prevent interference with his civil rights, when they had that opportunity.  The defendant that the Plaintiff listed so far, is only the company itself.  Other defendants may be added, after obtaining permission from the court, upon receipt of discovery, including the person that responded to the email discriminating against Plaintiff, and the conductor that discriminated.

7)      Plaintiff requests injunctive relief, declaratory relief, compensatory damages, punitive damages, and any other relief that the court shall determine, and/or any relief that will become apparent and appropriate upon the exchange of discovery.

## PARTIES

8)      **Plaintiff Aaron Abadi** is a resident of the State of New York, residing in New York County within the Southern District of New York. Plaintiff is a qualified individual with more than one disability as defined by the Americans with Disabilities Act (ADA), the Rehabilitation Act of 1973, and applicable state and local laws. He regularly travels for personal and in pursuit of business prospects and relies on common carriers such as Amtrak for access to interstate transportation. Plaintiff was directly harmed by Amtrak's discriminatory conduct, including and especially within the geographic boundaries of this judicial district.

9)      **Defendant National Railroad Passenger Corporation**, commonly known and doing business as **Amtrak**, is a corporation created by an act of Congress (49 U.S.C. § 24101 et

seq.) with its headquarters in Washington, D.C. Amtrak is a federally chartered, for-profit entity, but is also heavily subsidized by the federal government and operates under federal statutory obligations. Amtrak conducts business throughout the United States, including significant operations in New York State and within the Southern District of New York. Amtrak owns and/or operates multiple train stations, ticketing facilities, and service platforms in this District, including Pennsylvania Station (Penn Station) in Manhattan, where much of the discriminatory acts alleged herein occurred.

## JURISDICTION AND VENUE

10)     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the Americans with Disabilities Act of 1990 ("ADA") (42 U.S.C. § 12101 et seq.), the Rehabilitation Act of 1973 ("RA") (29 U.S.C. § 794 et seq.), and other federal civil rights and conspiracy statutes. Jurisdiction is also proper under 28 U.S.C. § 1343, as Plaintiff seeks redress for the deprivation of civil rights under color of law.

11)     Additionally, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states. Plaintiff is a citizen of the State of New York. Defendant National Railroad Passenger Corporation ("Amtrak") is incorporated by Congress and has its principal place of business in Washington, D.C., making it a citizen of the District of Columbia for diversity purposes.

12)     To the extent Plaintiff asserts claims arising under state or local law, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

13)     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Plaintiff's attempted use of Amtrak services and the discriminatory conduct suffered in New York City.

14)     Personal jurisdiction over Defendant Amtrak is proper because Amtrak conducts substantial and continuous business in this District, operates transportation services and facilities within it (including at New York Penn Station), and committed unlawful acts here that gave rise to Plaintiff's injuries.

## FACTUAL ALLEGATIONS

15)     Defendant Amtrak owns and operates the largest passenger train service in the United States, providing transportation for travelers throughout the country and beyond. Amtrak is the exclusive operator of long-distance rail service in the United States.

16)     The COVID-19 virus, originating from Wuhan, China, spread globally, causing significant deaths and hospitalizations from late 2019 through 2020, 2021, and 2022.

17)     The Centers for Disease Control and Prevention ("CDC") issued guidance requiring masks in public places and on transportation, with variations over time. The CDC guidance consistently exempted those who are disabled and could not wear a mask (Exhibit K).

18)     Throughout the pandemic, most mask mandates, guidance, and laws included exemptions for children under 2 years old and individuals with disabilities that prevent mask-wearing. The ADA issued guidance titled "The ADA and Face Mask Policies," stating: "Some people with autism are sensitive to touch and texture. Covering the nose and mouth with fabric can cause sensory overload, feelings of panic, and extreme anxiety." It recommends exemptions for such individuals (link: https://adasoutheast.org/disability-issues/ada-and-face-mask-policies/#:~:text=The%20ADA%20does%20not%20have,governments%20or%20private%20business%20owners *last downloaded 12/27/25*).

19)     Although Plaintiff does not have autism, he has sensory processing disorder ("SPD"), the underlying condition causing sensitivity in many autistic individuals. SPD is documented in Plaintiff's medical records (attached as Exhibit A: doctor's letter; Exhibit B: medical chart; Exhibit C: neurologist's affidavit from a prior action confirming ADA disability).

20)     Plaintiff has had SPD his entire life, preventing him from wearing glasses, sunglasses, baseball caps, neckties, starched shirts, or anything around the face or head due to severe sensory overload. (see Exhibit J – Letter from Abadi's optometrist)

21)     This is not mere discomfort; sensory dysfunction sends incorrect messages to the brain, leading to extreme discomfort, unbearable sensations, headaches, irritation, and involuntary removal of the item without regard for consequences. Plaintiff cannot wear a mask at all.

22)     In addition to sensory processing disorder, Plaintiff suffers from multiple other disabilities that further necessitate accommodations from Amtrak, including a torn meniscus in his left knee that causes significant mobility limitations, chronic pain, and instability when walking or standing for extended periods; he also experiences other musculoskeletal issues that affect daily activities such as walking long distances, standing on long lines, or navigating crowded stations. Due to these conditions, Plaintiff often relies on a cane for support during shorter distances and a wheelchair for longer ones, particularly in travel settings where prolonged standing or walking is required. Amtrak's history of "horrendous" accommodations extends beyond the mask policy to these mobility needs, as Plaintiff has encountered barriers like inaccessible platforms, inadequate assistance, and untrained staff, denying him equal access to services. This pattern of non-accommodation for his ongoing disabilities underscores the live nature of his claims, as future travel would likely involve similar discrimination without judicial intervention. These disabilities qualify under the ADA and related laws, substantially limiting major life activities and requiring reasonable modifications that Amtrak has failed to provide.

23)     Under ADA guidelines, Plaintiff qualifies for a mask exemption. SPD, when triggered, limits major life activities, fitting ADA criteria (28 C.F.R. § 36.105(1)(i)), affecting neurological and sensory systems (e.g., touch receptors concentrated on the face).

24)     CDC Guidance shows exemptions for those with disabilities who cannot wear a mask (See Exhibit K).  Similarly, the New York State Governor's Executive Order and the NYS Department of Health Order includes those same exemptions (See Exhibits L & M).

25)     Plaintiff's doctor's letter confirms he had COVID-19 and was no longer contagious; CDC states reinfections are rare (Exhibit D). Public accommodations must conduct

honest risk assessments; without symptoms, Plaintiff poses no "direct threat" (significant risk) under disability laws.

26)    The Equal Employment Opportunity Commission ("EEOC") guidance similarly limits "direct threat" to those with COVID-19 or symptoms (Exhibit E; link: https://www.eeoc.gov/laws/guidance/pandemic-preparedness-workplace-and-americans-disabilities-act *last accessed 12/27/25*).

27)    Even assuming, for the sake of argument, that Amtrak could justify excluding unmasked individuals as a "direct threat" under ADA standards (which requires proof of a significant risk of substantial harm based on objective medical evidence), such a policy would still be discriminatory unless Amtrak can prove that passengers wearing common, ineffective masks (such as loose cloth or surgical masks) do not pose a comparable risk. Without symptoms or evidence of active infection, the risk from an unmasked person like Plaintiff—who had already recovered from COVID-19 and posed no greater threat than others per CDC and EEOC guidance—is not significantly higher than from masked passengers if those masks provide only marginal protection, as indicated by various studies and health authority statements (Exhibit F). To treat unmasked disabled individuals differently without this proof would arbitrarily single them out based on their disability, rather than actual safety concerns, violating the ADA's prohibition on disparate treatment and requirement for individualized assessments.

28)    In other words, if common masks offer negligible or inconsistent protection against COVID-19 transmission—as acknowledged by evolving CDC, NIH, and WHO guidance—then allowing masked passengers while excluding exempt unmasked ones creates an

unjustified double standard. This cannot meet the ADA's high bar for a "direct threat" defense, as Amtrak bears the burden to show a meaningful risk distinction, not mere assumptions.

29)    Amtrak discriminated against Plaintiff, conspired to discriminate, and failed to prevent it. Many employees, staff, executives, and attorneys participated; discovery will identify them for potential addition as defendants.

30)    On January 22, 2021, at 4:45 PM, Plaintiff boarded Acela 2170 (Car 6, Seat 17F) from Philadelphia to New York without a mask due to his SPD.

31)    The ticket checker demanded a mask; Plaintiff explained his disability. The employee stated Plaintiff could not travel on Amtrak and yelled at Abadi, and said that Amtrak was unbound by ADA or state exemptions (NJ, PA, NY). The confrontation lasted 7–8 minutes; the moving train prevented ejection. Otherwise Abadi would have been thrown off the train. Non-disabled passengers were not treated this way.

32)    On August 20, 2021, Amtrak responded to Plaintiff's exemption request (Exhibit G), offering possible exemptions but with restrictions: 72-hour advance notice per trip, no guarantee, and no blanket approval.

33)    Non-disabled passengers board spontaneously; Plaintiff faced bureaucratic hurdles, deterring travel. This complexity was deliberate to exclude disabled individuals.

34)    The response came seven days after request, requiring per-trip approval despite Plaintiff's permanent disability and documentation.

35)     Amtrak created this system to keep Plaintiff off trains, assuming mask-exempt applicants are direct threats without individualized assessment—violating disability laws.

36)     This felt like gaslighting; Plaintiff was not a "direct threat" (had COVID-19, no symptoms, rare reinfection per CDC/EEOC). ADA requires assessment, not assumptions.

37)     Although Amtrak offered a process, it was overly complicated compared to non-disabled access. Most travel is spontaneous; this system made it impossible for Plaintiff, constituting discrimination. Amtrak could have issued a permanent exemption but chose not to.

38)     This 72-hour advance notice isn't just a delay—it's a dead end. If I travel to California or Florida on Amtrak, sure, maybe they'll let me go after the wait and the scrutiny. But coming back? I have to start over. File again. Wait again. Get scrutinized again. Take another Covid test. And pray—because every leg is a 'maybe.' So even if I make it out, I could get stranded. Can't come home. No backup plan. It's not accommodation. It's exile. And for someone like me—who couldn't fly or go by bus—this doesn't give access. It just traps me wherever I land.  I cannot ever go on an outgoing trip, because I will never know if they will allow me on the train for a return trip home.


**THE ARBITRATION AGREEMENT AND ITS UNENFORCEABILITY**

39)     Amtrak's Terms and Conditions (effective January 2019) include a mandatory Arbitration Agreement requiring AAA arbitration for all claims, under AAA Consumer Rules, with a $225 filing fee (officially waivable for hardship). It applies broadly to disputes arising from travel.

40)    A prior action in D.D.C. (Case No. 1:22-cv-03684) compelled arbitration under D.C. law, dismissing without prejudice (Exhibit N: D.C. Memorandum Opinion and Order, dated October 7, 2024).

41)    In good faith, Plaintiff initiated arbitration with AAA (Case No. 01-25-0003-2833), requesting a fee waiver due to indigence (e.g., SNAP benefits, no salary). AAA ignored him for months.

42)    AAA denied the waiver without explanation, despite submitted evidence. Plaintiff requested clarification; AAA ignored him but CC'd Amtrak's attorney, suggesting familiarity.

43)    AAA closed the case for non-payment, ignoring the pending waiver. Plaintiff's final letter (Exhibit O) requested a brief explanation for transparency; AAA ignored that request again.

44)    Amtrak, a major AAA client since 2019, benefits from this process, raising bias concerns. AAA's conduct made arbitration inaccessible and unfair.

45)    The Agreement is unenforceable under New York law as unconscionable (*Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1 (1988)).

46)    **Procedural Unconscionability**: Adhesive contract with no negotiation; lack of meaningful choice due to Amtrak's rail monopoly, exacerbated by Plaintiff's disability (alternatives like buses/planes cause overload) (*State v. Wolowitz*, 96 A.D.2d 47 (N.Y. App. Div. 1983), sliding scale).

47)    **Substantive Unconscionability**: $225 fee prohibitive; arbitrary waiver denial

bars access (*Matter of Brady v. Williams Capital Group*, 64 A.D.3d 127 (N.Y. App. Div. 2009);

*Brower v. Gateway 2000*, 246 A.D.2d 246 (N.Y. App. Div. 1998)). Evident partiality voids it

(*CPLR § 7511(b)(1)(ii)*; *Scandinavian Reinsurance Co. v. Continental Cas. Co.*, 668 F.3d 60 (2d

Cir. 2012)).

48)    The arbitration process deprives Plaintiff of the ability to vindicate his statutory

rights, as articulated in *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79 (2000). Moreover, New

York law differs materially from D.C. law, and the conduct of the AAA (American Arbitration

Association)—not previously before the D.C. court—introduces new facts warranting a different

outcome.


## INJURIES AND EFFECTS

49)    **Economic Losses**: Plaintiff suffered direct and consequential financial harm due

to Amtrak's discriminatory conduct. As airlines and bus companies imposed similar barriers to

travel for disabled individuals, Amtrak functioned as Plaintiff's only remaining viable mode of

transportation. By denying Plaintiff full access to its services, Amtrak impeded Plaintiff's ability

to travel for business, personal, and professional purposes, resulting in the loss of existing and

prospective commercial opportunities, including investment and fundraising meetings essential

to Plaintiff's livelihood.

50)    Plaintiff has suffered substantial financial harm, including lost business

opportunities, ruined investor relationships, and an inability to execute contracts and projects that

had been under development for several years. The damages from this interference are expected to reach multiple millions of dollars, subject to proof at trial.

51)    **Career and Business Disruption**: The travel restrictions imposed by Defendants caused substantial and ongoing injury to Plaintiff's professional endeavors. Plaintiff, who travels to over ten states annually for business, was unable to attend crucial meetings in states such as California, Texas, and Florida. This severely impaired Plaintiff's ability to maintain and grow business operations, leading to reputational damage and the collapse of funding prospects for a project in development for over seven years.

52)    **Emotional Distress and Psychological Harm**: Plaintiff experienced severe emotional distress, including anxiety, humiliation, and anguish, directly resulting from the discriminatory and degrading treatment by Amtrak personnel. Plaintiff's family members were also negatively affected, witnessing repeated incidents of mistreatment and exclusion that compounded the emotional toll.

53)    **Loss of Civil Liberties**: Amtrak's refusal to accommodate Plaintiff's disability and its enforcement of discriminatory policies effectively denied Plaintiff equal access to public transportation, in violation of constitutional and statutory civil rights. Plaintiff was treated as a second-class citizen due to his disability, stripped of his right to travel free from arbitrary and unlawful discrimination.

54)    **Ongoing Harm and Risk of Recurrence**: Plaintiff remains at risk of future harm absent injunctive and declaratory relief. The continued application of Amtrak's policies and its failure to train staff in disability rights have left Plaintiff vulnerable to repeated denial of services, recurrence of trauma, and exclusion from public life.

55)    **Dignitary Harm**: As a disabled individual entitled to full protection under federal law, Plaintiff was subjected to inhumane treatment that undermined his basic dignity, autonomy, and humanity. The cumulative effects of Amtrak's conduct constitute a fundamental violation of the values embedded in the Americans with Disabilities Act, the Rehabilitation Act, the State human rights acts, and common law tort principles.

## CAUSE OF ACTION

**COUNT ONE: Violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12131 et seq.)**

56)    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

57)    Defendant Amtrak is a "public entity" under Title II of the ADA, as it is a federally chartered corporation providing public transportation services and receiving substantial federal funding (42 U.S.C. § 12131(1)(B); see Settlement Agreement Between the United States and National Railroad Passenger Corporation (Dec. 2, 2020) (Exhibit P), where Amtrak agreed to ADA compliance for accessibility issues). (Also see Exhibit I)

58)    Plaintiff is a qualified individual with disabilities under the ADA, including sensory processing disorder (SPD), a torn meniscus in his left knee causing mobility limitations, and other physical impairments that substantially limit major life activities such as walking, standing, and sensory processing (42 U.S.C. § 12102; 28 C.F.R. § 35.108).

59)     Amtrak denied Plaintiff the benefits of its public transportation services by reason of his disabilities, including: (a) on January 22, 2021, when an Amtrak conductor harassed and attempted to eject him for not wearing a mask due to SPD, without engaging in an individualized assessment or providing reasonable modifications; (b) through its August 20, 2021 email response (Exhibit G), imposing a discriminatory 72-hour advance notice requirement for mask exemptions, with no guarantee of approval and additional demands like COVID-19 testing, which non-disabled passengers did not face; and (c) by failing to accommodate Plaintiff's ongoing disabilities, such as knee-related mobility needs, in a pattern of "horrendous" treatment reflected in Amtrak's history of ADA violations (e.g., DOJ settlement requiring Amtrak to fix inaccessible stations and pay $2.25 million to victims; NDRN report "Aboard (Except People with Disabilities): Amtrak's 23 Years of ADA Non-Compliance" (Apr. 12, 2023), documenting decades of delays and excuses). See Exhibit Q

60)     Amtrak's failure to provide reasonable accommodations—such as a blanket mask exemption or simplified approval process for Plaintiff's SPD, or mobility assistance for his torn meniscus and other limitations—constitutes discrimination under federal law, as it denied him equal access to services available to non-disabled passengers (28 C.F.R. § 35.130(b)(7), requiring public entities to modify policies to avoid discrimination unless fundamental alteration; see also Southeastern Cmty. Coll. v. Davis, 442 U.S. 397 (1979), clarifying that refusal to accommodate, when reasonable, violates anti-discrimination mandates). This non-accommodation was not isolated but part of a pattern, as evidenced by Amtrak's "horrendous" history (e.g., DOJ settlements for inaccessible stations), and directly caused Plaintiff's harms by turning public transportation into an inaccessible barrier.

61)    The 72-hour policy was not a reasonable accommodation but a barrier: It required
per-trip approval, forcing Plaintiff to wait and risk denial for each leg of travel, potentially
stranding him in remote locations like California or Florida without a way home, as return trips
demanded another full process; this turned spontaneous travel—available to non-disabled
passengers—into an unreliable gamble, exacerbating isolation and financial harm; for someone
with mobility limitations like Plaintiff's torn meniscus, this also meant prolonged exposure to
inaccessible alternatives (e.g., buses or planes causing physical strain); Amtrak's veto power over
approvals discriminated by imposing unequal terms, without justification under ADA regulations
requiring equal access (28 C.F.R. § 35.130(b)(1)).

62)    Amtrak's actions were intentional or deliberately indifferent, as evidenced by its
failure to train staff on ADA exemptions (despite federal guidance), its bureaucratic hurdles
designed to deter disabled travelers, and its broader pattern of non-compliance (e.g., OIG Report
OIG-A-2025-009 (Jul. 11, 2025), criticizing Amtrak's customer service for passengers with
disabilities). (Exhibit R)

63)    As a direct result, Plaintiff suffered harms including emotional distress, anxiety,
lost business opportunities (e.g., inability to travel for fundraising), financial losses from
alternative transportation, and deprivation of equal access to public services.

64)    This claim is not moot despite the end of Amtrak's COVID-19 mask mandate:
Plaintiff seeks compensatory damages for past discrimination, which survive policy changes (see
Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598
(2001), noting damages claims aren't mooted by policy changes); injunctive and declaratory
relief address ongoing risks from Amtrak's poor accommodation history for Plaintiff's other

disabilities (e.g., knee limitations requiring seating assistance or ramps), making the issues

"capable of repetition, yet evading review" (Friends of the Earth, Inc. v. Laidlaw Env't Servs.

(TOC), Inc., 528 U.S. 167 (2000)); under the voluntary cessation doctrine, Amtrak bears a

"heavy burden" to show it is "absolutely clear" the wrongful conduct won't recur, which it cannot

meet given its documented pattern of ADA violations (U.S. v. W. T. Grant Co., 345 U.S. 629

(1953); see also Olmstead-related Statement of Interest, emphasizing cessation doesn't moot if

changes are incomplete or recurrence likely).

65)    Moreover, under 28 U.S.C. §§ 2201–2202, this Court may declare the rights and

legal relations of parties in a case of actual controversy, whether or not further relief is or could

be sought. A declaratory judgment that Defendant's policies violated the Americans with

Disabilities Act, the Rehabilitation Act, and related federal, state, and local law will clarify

Plaintiff's legal rights and aid resolution of the civil rights and tort claims. Federal courts

routinely grant declaratory injunctive relief in civil rights disputes where constitutional or

statutory rights are asserted alongside other remedies. See *Steffel v. Thompson*, 415 U.S. 452

(1974) (recognizing declaratory relief with civil rights claims); *Zwickler v. Koota*, 389 U.S. 241

(1967) (clarifying rights under civil rights framework with declaratory judgment); *Los Angeles

County v. Humphries*, 562 U.S. 29 (2010) (civil rights action seeking declaratory and prospective

relief under § 1983); *Hydrick v. Hunter*, 669 F.3d 937, 940–41 (9th Cir. 2012) (civil rights

declaratory relief not barred by qualified immunity).

66)    Plaintiff seeks compensatory damages, injunctive relief (e.g., requiring Amtrak to

implement non-discriminatory accommodation policies and training), declaratory relief

(declaring Amtrak's past actions violated the ADA), and other remedies as appropriate (42

U.S.C. § 12133; 29 U.S.C. § 794a(a)(2).

**COUNT TWO: Violation of Section 504 of the Rehabilitation Act ("RA") (29 U.S.C. § 794)**

67)     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

68)     Defendant Amtrak is a recipient of substantial and continuous federal financial assistance, including appropriations from the U.S. Department of Transportation and other federal sources (see Exhibit I and Exhibit P). As such, Amtrak is subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The Department of Justice and other federal agencies have repeatedly confirmed that Amtrak must comply with § 504 (see, e.g., DOJ–Amtrak Settlement Agreement, Dec. 2, 2020, Exhibit P). Accordingly, Amtrak's failure to provide reasonable accommodations and its discriminatory policies toward disabled individuals, including Plaintiff, constitute violations of Section 504.

69)     Plaintiff is a qualified individual with disabilities under the RA, including sensory processing disorder (SPD), a torn meniscus in his left knee causing mobility limitations, and other physical impairments that substantially limit major life activities such as walking, standing, and sensory processing (29 U.S.C. § 705(20)(B), cross-referencing ADA definitions at 42 U.S.C. § 12102).

70)     Amtrak excluded Plaintiff from participation in, denied him the benefits of, and/or subjected him to discrimination under its federally assisted programs solely by reason of his disabilities, including: (a) the January 22, 2021 incident where an Amtrak conductor harassed and attempted to eject him for not wearing a mask due to SPD, without an individualized

assessment or reasonable modifications; (b) the August 20, 2021 email (Exhibit G) imposing a 72-hour advance notice requirement for exemptions, with no guaranteed approval and added burdens like COVID-19 testing, which non-disabled passengers avoided; and (c) Amtrak's pattern of "horrendous" accommodations for Plaintiff's ongoing disabilities, such as failing to address knee-related needs (e.g., priority seating and/or assistance), consistent with its history of RA violations (e.g., DOJ Settlement Agreement (Dec. 2, 2020), requiring Amtrak to remedy inaccessible facilities and pay compensation (Exhibit P); NDRN report "Aboard (Except People with Disabilities): Amtrak's 23 Years of ADA Non-Compliance" (Apr. 12, 2023), highlighting systemic failures in accessibility and customer service for disabled passengers (Exhibit Q)).

71)    The 72-hour policy discriminated by creating unequal access: It mandated per-trip approvals, risking denial for each travel segment and potentially stranding Plaintiff in distant states like California or Florida without reliable return options; this bureaucratic veto power turned public transportation into an unreliable service for disabled individuals, while non-disabled passengers enjoyed spontaneous access; for Plaintiff, with mobility limitations from his torn meniscus, this exacerbated harms by forcing reliance on inaccessible alternatives that caused physical strain; Amtrak's actions violated RA regulations requiring non-discrimination and reasonable modifications (28 C.F.R. § 41.51; 49 C.F.R. § 27.7).

72)    Amtrak's discrimination was intentional or with deliberate indifference, as shown by its failure to prevent conspiracy among employees (e.g., conductor and email responder) to deny accommodations, lack of training on disability laws despite federal mandates, and persistent non-compliance patterns (e.g., OIG Report OIG-A-2025-009 (Jul. 11, 2025), critiquing Amtrak's handling of disabled passengers (Exhibit R)).

73)    As a direct result, Plaintiff suffered injuries including emotional distress, anxiety,
lost business opportunities (e.g., inability to travel for fundraising), financial losses, and
exclusion from federally assisted transportation benefits.

74)    This claim is not moot despite the end of the mask mandate: Plaintiff seeks
compensatory damages for past violations, which remain viable and justiciable even after the
challenged policy is rescinded. The Supreme Court has made clear that nominal or actual
damages are sufficient to preserve a live controversy (see Uzuegbunam v. Preczewski, 592 U.S.
111 (2021)). As Plaintiff alleges concrete harm resulting from Defendant's past conduct, the case
remains live and redressable under Article III. Additionally, injunctive and declaratory relief
target Amtrak's ongoing poor accommodations for Plaintiff's other disabilities (e.g., knee
limitations), rendering the controversy "capable of repetition, yet evading review" (Friends of the
Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167 (2000)); under voluntary cessation,
Amtrak cannot meet its "heavy burden" to prove no recurrence, given its documented RA non-
compliance history (U.S. v. W. T. Grant Co., 345 U.S. 629 (1953); see Olmstead v. L.C. ex rel.
Zimring, 527 U.S. 581 (1999), emphasizing scrutiny in disability cases); courts reject mootness
in RA actions with systemic issues and defendant patterns (e.g., Henrietta D. v. Bloomberg, 331
F.3d 261 (2d Cir. 2003), preserving claims despite partial remedies). Moreover, declaratory relief
declaring Amtrak's actions violated the RA would solidify Plaintiff's parallel state human rights
claims by establishing key facts and legal principles (e.g., Plaintiff's disability status and the
discriminatory nature of Amtrak's policies) applicable under analogous state laws, ensuring those
claims remain live and not moot.

75)      Plaintiff seeks compensatory damages, injunctive relief (e.g., mandating non-discriminatory policies and training), declaratory relief (affirming RA violations), and other remedies (29 U.S.C. § 794a(a)(2), incorporating ADA Title II remedies).


**COUNT THREE: Violation of 42 U.S.C. § 1983 (Deprivation of Rights Under Color of Law)**

76)      Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

77)      Defendant Amtrak acted under color of law as a governmental entity for § 1983 purposes, given its federal charter, substantial government control, and performance of public functions (42 U.S.C. § 1983; see Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374 (1995), holding Amtrak a state actor for constitutional purposes. Moreover, Amtrak maintains its own police force, the Amtrak Police Department (APD), which is authorized under federal law (49 U.S.C. § 28101) and commissioned in various states to enforce Amtrak policies, including those related to passenger access and accommodations; APD officers operate under color of law, with authority to arrest, detain, or remove individuals, thereby backing Amtrak's refusals to allow disabled passengers like Plaintiff to travel with the threat of police intervention.

78)      Amtrak deprived Plaintiff of rights secured by the Constitution and federal laws (e.g., due process and equal protection under the Fifth Amendment, as incorporated against federal actors via Bolling v. Sharpe, 347 U.S. 497 (1954); rights under the ADA and RA), through its policies and customs, including the discriminatory mask enforcement and 72-hour

approval process that treated disabled passengers unequally; furthermore, Amtrak's failure to provide reasonable accommodations—such as mask exemptions or mobility assistance for Plaintiff's torn meniscus—constitutes discrimination under federal regulations (28 C.F.R. § 35.130(b)(7), requiring modifications to avoid discrimination on the basis of disability unless fundamentally altering the service).

79)    Specific deprivations include: (a) the conductor's harassment and attempted ejection on January 22, 2021, violating Plaintiff's right to equal access; (b) the August 20, 2021 email (Exhibit G) imposing arbitrary barriers that risked stranding Plaintiff and denied him meaningful use of public transportation; (c) failure to accommodate ongoing disabilities like his torn meniscus, reflecting a custom of deliberate indifference (see Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), allowing entity liability for policies causing violations; DOJ Settlement (2020), evidencing Amtrak's systemic issues (Exhibit P)); these refusals were enforced or potentially enforceable by APD, amplifying the deprivation under color of law.

80)    Amtrak's actions were pursuant to official policy or longstanding custom, with deliberate indifference to training needs, proximately causing Plaintiff's harms (e.g., emotional distress, lost opportunities).

81)    This claim is not moot for the reasons stated in prior counts, including ongoing risks and the need for remedies addressing Amtrak's patterns.

82)    Plaintiff seeks compensatory damages, injunctive and declaratory relief, and other remedies under § 1983.

**COUNT FOUR:** Violation of 42 U.S.C. § 1985(3) — Conspiracy to Interfere with Civil Rights

83)    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

84)    Defendant Amtrak, through its conduct and that of its employees, conspired to interfere with Plaintiff's civil rights in violation of 42 U.S.C. § 1985(3), by denying him access to public transportation on the basis of his disability and by collaborating—formally or tacitly—with others in furtherance of discriminatory policies that excluded disabled passengers from equal access to travel.

85)    Amtrak's employees, including station agents, train conductors, and policy administrators, participated in a coordinated pattern of conduct designed to frustrate Plaintiff's legal right to reasonable accommodation. These actors shared a tacit understanding to treat individuals like Plaintiff—who are unable to wear masks due to legitimate disabilities—as health threats or "problem passengers," despite federal law requiring individualized assessments. The animus toward this protected class, especially during the COVID-19 period, was visible, vocal, and sustained. Conductors refused accommodations while asserting they were "not bound by any of those laws," referring to the ADA and related protections.

86)    The conspiracy was not isolated to one individual or incident. Amtrak's systemic policy—reflected in its August 20, 2021 correspondence (Exhibit G)—imposed a burdensome approval process with vague criteria, requiring 72-hour advance notice for each trip with no assurance of approval. This was not an individualized accommodation; it was a discriminatory barrier. While no explicit memo may exist ordering discrimination, such conduct can be inferred

from Amtrak's consistent failure to train staff, its nationwide enforcement of these rules, and its repeated denials of access to passengers known to have disabilities.

87)    This Court need not find a signed agreement to infer conspiracy. As the Second Circuit has held, a conspiracy "need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct" (*Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995)).

88)    Although defendants may attempt to invoke the intracorporate conspiracy doctrine to bar Plaintiff's § 1985(3) claim, that doctrine is not applicable here Under that doctrine, a corporation and its employees acting strictly within the scope of their employment are treated as a single legal actor incapable of conspiring with itself. See *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (applying intracorporate conspiracy doctrine in § 1985 context). However, the doctrine recognizes exceptions — for instance, where individuals act "outside the course of their employment," such that their conduct cannot be attributed solely to the corporate entity. *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 840–41 (6th Cir. 1994) (employees may conspire if acting beyond scope of employment). Moreover, courts and commentators have noted that the doctrine's applicability to civil rights claims is neither uniform nor absolute, and its extension beyond traditional antitrust cases has been questioned. In this case, Plaintiff alleges that multiple actors at different levels and locations enforced inconsistent policies, applied conflicting standards, and acted without coordination under a single uniform directive, resulting in discriminatory conduct that cannot fairly be attributed to a single corporate "actor." Discovery will show that there was *no uniform rule*

*applied consistently* from Amtrak headquarters to front-line personnel, and thus this is not a situation where the intracorporate doctrine should preclude a conspiracy finding.

89)    The discriminatory conduct was motivated by a class-based animus against disabled individuals who were exempt from mask mandates. The social hostility toward such individuals during the pandemic became normalized in transportation settings, and frankly in multiple retail settings. Plaintiff, like many others with sensory-based disabilities, experienced verbal abuse, exclusion, and a lack of empathy. This animus—rooted in the political and cultural divide over masking—resulted in treating the mask-disabled not as individuals deserving of accommodation, but as enemies of public health.

90)    Amtrak's own practices confirm this animus. It treated all unmasked passengers as "direct threats," refused to grant permanent exemptions, and established a process seemingly designed to discourage use rather than offer access. These policies, enforced nationwide by numerous employees, formed a web of discriminatory action—a conspiracy in both legal and practical effect.

91)    Plaintiff was injured in his person and property by this conspiracy. He lost travel opportunities, business prospects, and endured emotional and physical distress, as well as exclusion from public accommodations funded by federal dollars. Discovery will reveal additional parties to the conspiracy, including employees and possible contractors or affiliates acting in concert with Amtrak to deprive Plaintiff of his rights.

92)    Plaintiff seeks compensatory damages, declaratory relief, and all other remedies available under § 1985(3).

**COUNT FIVE:** Violation of 42 U.S.C. § 1986 — Neglect to Prevent Civil Rights Violations

93)     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

94)     Pursuant to 42 U.S.C. § 1986, Defendant Amtrak is liable for knowingly permitting civil rights violations that it had the power to prevent. Amtrak had actual or constructive knowledge that its conduct, and the conduct of its employees, constituted discrimination against a federally protected class of individuals—namely, those with disabilities who cannot wear masks due to legitimate sensory or neurological conditions.

95)     Amtrak had the ability to intervene and prevent this misconduct, including the implementation of a discriminatory exemption system, the failure to train staff on ADA obligations, and the hostile treatment of mask-exempt passengers. Despite that power, Amtrak failed to revise its policies, failed to provide a permanent accommodation process for legitimate disabilities, and failed to take any corrective action when its employees engaged in overtly discriminatory behavior.

96)     Amtrak's inaction in the face of known violations qualifies as neglect under § 1986. Its upper management received multiple notices and complaints regarding the exclusion of disabled passengers—including Plaintiff's own communications—yet failed to intervene. Indeed, Amtrak's response was to double down on its policy by layering it with more complexity and requiring 72-hour approvals for each leg of travel.

97)    While § 1986 includes a one-year limitations period, equitable tolling is warranted. Plaintiff acted diligently by initiating a law suit in the DC Court while the discrimination was ongoing, then attempting to seek arbitration, as compelled by the D.C. court, and then promptly returned to court when arbitration became inaccessible. The conspiracy and resulting injuries were ongoing, not discrete. The limitations period should begin no earlier than when arbitration efforts were exhausted in November 2025, placing this claim well within the statutory window.

98)    Equitable tolling is also supported by Plaintiff's pro se status, the confusing procedural posture of this case, and his good-faith efforts to exhaust administrative and arbitration remedies first (see *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96 (1990)). Dismissing this claim based on minor timing technicalities would be inconsistent with the remedial purpose of § 1986 and the realities of a disabled pro se litigant navigating multiple forums.

99)    As a result of Amtrak's willful neglect, Plaintiff suffered injuries including exclusion from public accommodations, emotional distress, loss of income and opportunity, and unequal treatment under the law.

100)    See Count Four, Section C above, for a detailed discussion of why the intracorporate conspiracy doctrine does not bar liability under § 1985(3) in this case. That analysis applies equally here, as § 1986 imposes liability for neglecting to prevent such conspiracies.

101)    Plaintiff seeks compensatory damages and any other relief the Court deems just and proper under § 1986.

**COUNT SIX: Violation of the New York State Human Rights Law ("NYSHRL")**

102)    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

103)    Defendant Amtrak violated Plaintiff's civil rights under the New York State Human Rights Law (Executive Law § 290 et seq.) by denying him full and equal access to a place of public accommodation based on his disability, in violation of § 296(2)(a).

104)    Plaintiff, a New York resident with multiple disabilities—including sensory processing disorder, a torn meniscus, and other conditions affecting mobility and neurological function—was refused reasonable accommodation by Amtrak when attempting to travel by train. Despite requesting such accommodations through formal channels, including prior written requests and attempted pre-approvals under Amtrak's policy (Exhibit G), he was barred from travel because he was unable to wear a mask due to his disabilities.

105)    Amtrak's policies imposed arbitrary requirements—such as 72-hour advance notice for each trip leg, undefined and shifting documentation criteria, and no guarantee of approval—that effectively denied individuals with these disabilities meaningful access to public transportation. Such policies do not constitute individualized accommodations under the law; they are discriminatory barriers to access.  Non-disabled people were not required to go through the same rigamarole, effectively creating an unequal access by discriminating against Plaintiff because of his disability.

106)    Under NYSHRL § 291(2), the right to use places of public accommodation without discrimination on the basis of disability is recognized as a civil right. § 292(9) specifically defines places of public accommodation to include "all public conveyances operated on land or water or in the air, as well as the stations and terminals thereof." § 296(2)(a) makes it unlawful for the operator of any such public accommodation to withhold "any of the accommodations, advantages, facilities or privileges" due to disability.

107)    Plaintiff was excluded from using Amtrak's services on multiple occasions by being subjected to an unreasonable, unreliable, and discriminatory approval process that was not imposed on non-disabled passengers. Although Amtrak nominally offered a mask-exemption procedure, that process required advance notice for each trip, imposed shifting and undefined requirements, provided no assurance of approval, and effectively denied Plaintiff the ability to travel on equal terms. As a result, Plaintiff was unable to use Amtrak's services in the same manner as non-disabled individuals, including being unable to rely on access to both outbound and return travel despite holding paid reservations. Amtrak's refusal to provide a workable, individualized accommodation constitutes unlawful disability discrimination under New York State law.

108)    As a direct and proximate result of this unlawful discrimination, Plaintiff suffered damages including emotional distress, loss of transportation, denial of public accommodation, and related economic losses. He seeks compensatory damages, injunctive and declaratory relief, and any other relief the Court deems just and proper under NYSHRL.

**COUNT SEVEN:** Violation of the New York City Human Rights Law ("NYCHRL")

109)    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

110)    Defendant Amtrak further violated the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq., by discriminating against Plaintiff based on his disability in the provision of public accommodation services within the City of New York.

111)    Amtrak operates public rail service and maintains multiple facilities in New York City, including Pennsylvania Station in Manhattan, which falls under the jurisdiction of the NYCHRL. On multiple occasions, Plaintiff was denied meaningful access to Amtrak services in and through New York City. These denials were based on his inability to wear a mask due to documented sensory and neurological disabilities, as well as other physical conditions, and were reinforced by policies that failed to provide a functional pathway to accommodation.

112)    Under NYCHRL § 8-107(4)(a), it is unlawful for any provider of public accommodations to "directly or indirectly refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof" based on disability. The law must be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof," and courts are directed to interpret the law independently from federal and state counterparts (see N.Y.C. Admin. Code § 8-130(a)).

113)    Unlike federal and state laws, NYCHRL requires defendants to prove that any discriminatory practice was "no more than a trivial inconvenience." Here, Amtrak's policies and conduct were far from trivial: they involved blocking Plaintiff from boarding, failing to

accommodate him despite known disabilities, and erecting procedural hurdles that rendered train travel practically impossible. These harms took place in part within New York City and resulted in real and ongoing exclusion from services.

114)    Plaintiff seeks all remedies available under the NYCHRL, including compensatory damages, injunctive relief, declaratory relief, and attorneys' fees if applicable, under N.Y.C. Admin. Code § 8-502(g).

**COUNT EIGHT: Violation of New York City Human Rights Law – Discriminatory Written Communication**

115)    Defendant Amtrak violated the New York City Human Rights Law by issuing a written communication to Plaintiff (attached as Exhibit G), stating that he would not be permitted to travel on Amtrak trains unless he complied with burdensome and discriminatory conditions based on his disability.

116)    This written notice required Plaintiff to give 72 hours' advance notice, subjected him to a vague and undefined approval process, and denied him equal access to train services solely because of his sensory disabilities and associated inability to wear a mask.

117)    Pursuant to NYC Admin. Code § 8-107(4)(a)(2), it is an unlawful discriminatory practice for any public accommodation to "make any declaration, publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement" indicating that full and equal enjoyment of facilities will be denied on account of disability.

118)    Amtrak's communication violated this law by explicitly imposing more restrictive conditions on Plaintiff's access than are imposed on nondisabled passengers.

119)    Plaintiff incorporates by reference all preceding paragraphs.

120)    Plaintiff's injuries are a direct result of this discriminatory conduct.


**COUNT NINE: Violation of New York City Human Rights Law – Failure to Engage in Cooperative Dialogue**

121)    Amtrak also violated the NYC Human Rights Law by failing to engage in a cooperative dialogue with Plaintiff regarding his request for a reasonable accommodation related to his disability.

122)    Plaintiff made Amtrak aware of his need for a mask exemption due to his sensory processing disorder and other related disabilities and sought guidance on how to travel safely and legally under Amtrak policy.

123)    Instead of discussing accommodation options in good faith, Amtrak issued a blanket denial, demanded 72-hour notice, imposed ambiguous requirements, and refused to clarify whether travel would be permitted even with advance notice—effectively shutting down any meaningful communication.

124)    Under NYC Admin. Code § 8-107(28)(b), public accommodations are required to engage in a cooperative dialogue within a reasonable timeframe after a person has requested an accommodation or where it is clear that one may be needed.

125)    Defendant's failure to provide this dialogue or propose any alternative options constitutes an independent and actionable violation of the law.

126)    Plaintiff incorporates by reference all preceding paragraphs.

127)    Plaintiff's injuries are a direct result of this unlawful conduct.

**COUNT TEN: – Negligence**

128)    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

129)    Defendant Amtrak owed Plaintiff a duty of reasonable care as a common carrier and provider of public transportation services, including a duty to comply with federal, state, and local disability laws, to train its employees appropriately, and to provide reasonable accommodations to passengers with known disabilities.

130)    Amtrak breached that duty by, among other things:

131)    Failing to train employees on ADA and disability accommodation requirements;

132)    Allowing employees to arbitrarily deny access to disabled passengers;

133)    Implementing and enforcing a burdensome, vague, and unreliable accommodation policy that foreseeably prevents disabled passengers from traveling;

134)    Failing to ensure that disabled passengers would be able to complete return travel once a trip had begun.

135)    Amtrak knew or should have known that these failures would foreseeably cause harm to disabled passengers, including emotional distress, humiliation, loss of transportation, and physical hardship.

136)    As a direct and proximate result of Amtrak's negligence, Plaintiff suffered damages including emotional distress, anxiety, humiliation, loss of access to transportation, and economic harm.

**COUNT ELEVEN:  Negligent Infliction of Emotional Distress**

137)    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

138)    At all relevant times, Amtrak owed Plaintiff a special duty of care arising from its role as a common carrier and public transportation provider; especially since it is the exclusive rail service that is owned by the U.S. government.

139)    Amtrak breached that duty by subjecting Plaintiff, a person with known disabilities, to discriminatory treatment, uncertainty regarding his ability to travel, and the risk of being stranded away from home due to an unreliable accommodation process.

140)    Amtrak knew or should have known that denying or conditioning access to transportation for a disabled passenger would foreseeably cause serious emotional distress.

141)    Plaintiff suffered substantial emotional distress, including anxiety, humiliation, fear of travel, and ongoing distress related to future use of Amtrak services.

142)    Such distress was a foreseeable result of Amtrak's negligent conduct.

**COUNT TWELVE:  Intentional Infliction of Emotional Distress**

143)    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

144)    Amtrak, through its employees and policies, engaged in extreme and outrageous conduct by knowingly refusing to accommodate Plaintiff's disability, publicly confronting him, stating that it was not bound by disability laws, and subjecting him to humiliation and exclusion from public transportation.

145)    Amtrak acted intentionally or with reckless disregard for the probability that its conduct would cause severe emotional distress.

146)    Plaintiff suffered severe emotional distress as a result of this conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Aaron Abadi respectfully requests that this Court enter judgment in his favor and against Defendant National Railroad Passenger Corporation (Amtrak), and award the following relief:

A. **Compensatory Damages**

For physical, emotional, and dignitary harm caused by Defendant's unlawful discrimination, negligence, and intentional misconduct, including but not limited to pain and suffering, loss of enjoyment of life, humiliation, mental anguish, and inconvenience, in an amount not less than $800,000, with the precise sum to be determined at trial or through discovery.

B. **Punitive Damages**

As permitted under federal and state law—including claims under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, 42 U.S.C. § 1985(3), the New York State Human Rights Law (NYSHRL), and the New York City Human Rights Law (NYCHRL)—for Defendant's willful, wanton, and reckless disregard of Plaintiff's federally protected rights.

C. **Declaratory Relief**

A declaration that Plaintiff was and is lawfully exempt from mask mandates by reason of his

documented disability; that Defendant's conduct violated Plaintiff's rights under the Americans with Disabilities Act and related civil rights statutes; and that disability laws remain fully applicable during public health emergencies.

### D. **Injunctive Relief**

1. Ordering Defendant to immediately cease and desist from imposing unlawful prerequisites or discriminatory barriers on individuals with disabilities;

2. Requiring Defendant to allow Plaintiff access to all trains, terminals, and facilities on the same terms as other passengers;

3. Mandating comprehensive training for all Amtrak staff on compliance with disability rights laws, including the ADA, Rehabilitation Act, NYSHRL, and NYCHRL;

4. Requiring Defendant to publicly post or distribute updated disability accommodation policies that reflect its obligations under the law.

### E. **Nominal Damages**

In the alternative as a bare minimum, or in addition to compensatory damages, Plaintiff seeks nominal damages for the violation of his constitutional and statutory rights.

### F. **Attorneys' Fees and Costs**

Awarding Plaintiff the costs of litigation, including reasonable attorneys' fees under 42 U.S.C. § 1988, 42 U.S.C. § 12205 (ADA), 29 U.S.C. § 794a(b) (Rehabilitation Act), and all other applicable statutes.

G. **Pre-Judgment and Post-Judgment Interest**

As allowed by law.

H. **Such Other and Further Relief**

As the Court may deem just, proper, and equitable under the circumstances.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable, including but not limited to all claims arising under 42 U.S.C. § 1983, 1985, & 1986, the Americans with Disabilities Act, the Rehabilitation Act, and all tort claims under state law.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

Respectfully submitted December 27, 2025,

*s/Aaron Abadi*
AARON ABADI, Plaintiff
82 Nassau Street Apt 140
New York, NY 10038
516-639-4100
Email:  abadi.rne@gmail.com